## ROZIER *v.* THE STATE.

1. A complaint that the trial judge ruled out specified testimony cannot be sustained when the approved brief of evidence shows that this very testimony was admitted at some stage of the examination of the witness.

2. On a trial for murder, an instruction based on the statement of the accused that during his absence the deceased had committed adultery with the wife of the accused was not subject to the assignment of error that it injected into the case a contention and an issue not made by the evidence or by the defendant's statement or by any inference to be drawn therefrom.

No. 3385. September 5, 1923.

Indictment for murder. Before Judge Summerall. Coffee superior court. July 29, 1923.

*McDonald & Willingham,* for plaintiff in error.

*George M. Napier, attorney-general, A. B. Spence, solicitor-general, Seward M. Smith, assistant attorney-general,* and *L. E. Heath,* contra.

HINES, J.   1.   In one ground of his motion for new trial the defendant complains that the court erred in ruling out the evidence of the witness Jim Richardson, and in withdrawing the same from the consideration of the jury, said evidence being as follows: "I had occasion to arrest Jim Lee Wells pretty soon after the killing, and he had a pistol when I arrested him." This evidence appears in the brief of the evidence, which was duly approved by the court as being true and correct. Where complaint is made in a motion for new trial that the court ruled out certain testimony of a named witness, and in the brief of the evidence it appears that the witness did testify to the facts so ruled out, and both the motion for new trial and the brief of the evidence are duly approved by the presiding judge, this court can not hold that the brief of the evidence is incorrect, but must reconcile the two statements on the theory that, while at one time the court made the ruling complained of, at some stage of the examination the testimony was admitted. Under such facts, the ruling will not require the grant of a new trial. *Woods* v. *State,* 137 *Ga.* 85 (72 S. E. 908); *Kent* v. *Central of Ga. Ry. Co.,* 144 *Ga.* 7 (85 S. E. 1017).

2.   The defendant alleges that the court erred in charging the jury as follows: "It is contended on the part of the defendant that the deceased had been guilty of frequent sexual intercourse with his wife. I charge you, gentlemen, where in a murder case the defendant sets up the defense that the homicide was committed because the deceased had committed an act or acts of adultery with the wife of the defendant, it is incumbent upon the defendant to show that the killing was necessary to prevent the act of adultery, or to prevent the completion of the act after it had been begun. If you find from the evidence or the defendant's statement that the act of adultery had been completed, and a reasonable time, sufficient for reason to reascend its throne, had elapsed before the homicide was committed, the killing would be attributed to deliberate revenge, and the defendant would be guilty of the offense

12

of murder." The errors assigned are: (*a*) that this charge injected into the case a contention and an issue not made either by the evidence or by the defendant's statement, or by any inference to be drawn therefrom, and was hurtful and harmful to him, and tended to confuse and mislead the jury; (*b*) that the court instructed the jury to find the defendant guilty if in their opinion there had been time for reason to ascend its throne after the commission of the acts of adultery referred to by the defendant, notwithstanding the fact that no defense was urged for the killing on the ground of adultery; (*c*) that said instruction, when viewed in the light of the defendant's statement showing his long knowledge of the acts of adultery by his wife, is an intimation by the court that the defendant was making an unsuccessful attempt to establish the contention that the killing was justified on account of such acts of adultery; (*d*) that the last sentence of this instruction directed the jury to find the defendant guilty if they should find from the evidence that a considerable period of time had elapsed since the acts of adultery between the deceased and the defendant's wife, when the defendant in his statement admitted that a great period of time had elapsed in which he made no effort to resent the acts of adultery; (*e*) that the entire defense of the defendant was based upon self-defense; (*f*) that this charge conveyed to the jury the fact that the defendant was endeavoring to set up two defenses for the killing, one based upon adultery, when such was not the case, and was therefore inapt, hurtful, and misleading.

The defendant made a statement to the jury, in which he told them that he had been drafted into the military service and was sent to France. On his return he found that his wife had been guilty of acts of adultery which had resulted in the birth of a child. His wife told him that the deceased, by persuasion and constant importunities, had induced her to yield to his lustful embraces, in consequence of which she became pregnant and was delivered of a child begotten of her by the deceased. Upon getting this information, he declined to go back to his wife or live with her, and had ever since lived separate and apart from her. On the day of the homicide he and the deceased met; and the latter walked up to him and said: "Eph, how come you didn't speak to me just now when I spoke to you?" The defendant replied: "I didn't hear you say anything, and I didn't say anything to you." The

deceased said: "You are a God damned liar, you heard me. You are just mad with me cause I went with Cora [wife of the defendant] when you were in the army; and I have been going with her since you came back. These shoes, I bought them with some of the money you sent back." The defendant replied: "That is all right; you are welcome to go with her and take her and live with her, and I don't ever intend to go back and live with her as long as I live." The deceased then said: "What in the hell is the use of me having to take care of her, when I can go with her and have just as good a time as I want to without marrying her?" The defendant replied: "All right, you are welcome to stay with her and go with her all you want to. Is that what you stopped me here for, to curse and bulldoze me about what you done while I was in the army?" The deceased replied: "I didn't stop you for a damn thing else." The defendant said: "Well, all right, I will go along to church where I started; but I don't care to talk to you at all concerning that, no way at all." The deceased replied: "You had better talk now, because if you don't you are liable not to get no God damn chance." The above interview took place in the morning. The defendant further stated that he and the deceased met that night. The deceased said to him: "Well, Eph, you must come up to see me sometime," and the defendant replied: "All right, I will, you must come." The deceased made no reply. As he went down the road the deceased kept looking around at him. The deceased walked up by the side of a woman, caught her by an arm, snatched his pistol out of his left hip pocket and fired under his arm back at the defendant. The first shot did not hit the defendant, who jumped out of the road and fell across a ditch on its side. As the defendant was struggling to get up, the deceased shot him again and hit him in the leg, when the defendant pulled out his pistol and shot at the deceased as fast as he could, the shots taking effect and killing the deceased.

The instructions complained of were not erroneous for the reasons assigned by the defendant. In a criminal case the defendant has "the right to make to the court and jury such statement in the case as he may deem proper in his defense" (Penal Code (1910), § 1036); and where the defendant in the exercise of this right made a statement to the jury, in which he told them that the deceased had been guilty of acts of adultery with his wife while he

was in the military service of his country in France, which resulted in the birth of a child begotten of the wife by the deceased, and that on the day of the homicide the deceased boasted to him of these illicit relations and that he could continue them, the defendant will be held to have made this statement in justification or mitigation of the homicide, although he did not expressly state or urge by his counsel that he killed the deceased on account of his acts of adultery with defendant's wife; and the court did not err in giving to the jury instructions applicable to a homicide resulting from acts of adultery committed by the deceased with the wife of the defendant. While the court is not required to charge upon a theory of defense arising solely from the statement of the accused, in the absence of a timely written request so to charge (*Lampkin* v. *State,* 145 *Ga.* 40 (6)), the court is authorized to call the attention of the jury to a contention or theory of defense arising from the defendant's statement and to give instructions pertinent to such theory, although the defendant may not expressly state that he relies on such theory of defense. The alleged grounds of error in the above instruction, that the " entire defense of the defendant was based upon the law of self-defense," and that it was inapt and harmful, because it misled the jury into believing that the defendant was endeavoring to set up two defenses, one based upon adultery, are not well taken, the contrary appearing from the statement of the defendant to the jury in his own defense. The present case does not fall within the rulings made in *Teasley* v. *State,* 104 *Ga.* 738 (30 S. E. 938), *Rooks* v. *State,* 119 *Ga.* 431 (46 S. E. 631), *Strickland* v. *State,* 8 *Ga. App.* 421 (4) (69 S. E. 313), and *Bennett* v. *State,* 19 *Ga. App.* 442 (91 S. E. 889), to the effect that it is error for the trial judge to give to the jury an instruction wholly unwarranted by the facts in the case. The last sentence of this instruction is not erroneous, the court having fully instructed the jury upon the law of self-defense, and having instructed the jury to acquit the defendant if they found that he was acting in self-defense.

3. The verdict is supported by the evidence, and is not contrary to law.

*Judgment affirmed. All the Justices concur, except*

Russell, C. J., dissenting. The defendant (after stating how he returned from France and was discharged from the army, re-

turned home and went to get his wife, found her with a bastard child) related the conversation he had with his wife at this meeting, when she told him that the deceased was the father of the child and had been having " implication" with her during his absence.   He then stated:   "So I came on back home and told her that I wouldn't want to live with her and be there with her any more,  .  .  and I went to my sister's house and stayed with her that night, and the next morning I got up and caught the A., B. & A. train and went out to where Pa was.   My mother and father asked me when I got there where was Cora [his wife], and I told them where she was and they asked me why I didn't bring her back, and I told them what was the reason — that she had the little baby, and how it was and how she told me it was.  .  .  So I was working for Mr. Flem Harper and them, and my mother and father had told me they would let her alone; and I asked Mr. Harper about it, and he told me the same thing they told me, and he said that boy would hurt me or me hurt him, one.   And I let her alone and didn't go around her and bother her at all, and all the last year I stayed there and worked,  .  .  and I didn't go around Cora or around where John Mobley [the deceased] was, or have a thing to do with them at all, because I had done let her alone.  .  .  I started to church, and James Lee and John Mobley was standing out there,  .  .  and I seen them standing out there and I didn't say a word to them and I didn't hear them say anything to me.  .  .  After I got down there a little piece John Mobley turned around and said:  'Eph, wait there a minute,' and I stopped,  .  .  and he came on with both of his hands in his hip-pockets.   He walked right up to me and said:  'Eph, how come you didn't speak to me just now when I spoke to you?'  'I didn't hear you say anything, and didn't say anything to you.' And he said, 'You are a God damned liar.  .  .  You are just mad with me cause I went with Cora when you was in the army, and have been going with her since you come back.'   And he said, 'These shoes, I bought them with some of the money you sent back.'   I said,  'That is all right; you are welcome to go with her and take her, live with her, and I don't never intend to go back and live with her as long as I live.'   I said, 'You are plumb welcome to stay with her.'   And he said, 'What in the hell is the use of me having to take care of her when I can go with her and

have just as good time as I want to without marrying her?' I said, ' All right, you are welcome to stay with her and go with her all you want to. Is that what you stopped me here for, to curse and bulldoze me about what you did while I was in the army?' And he said: ' I didn't stop you for a damn thing else.' And I said: ' Well, all right, I will go along to church where I started; but I don't care to talk to you at all concerning that, no way at all,' and he said, ' You had better talk now, because if you don't talk now you are liable not to get no God damn chance.' And I walked on to the church, and I didn't see him or James Lee until that night after meeting after dark." The defendant then continued with his statement as to how the killing occurred. None of the evidence introduced in behalf of the defendant related in any way to the adultery of his wife and John Mobley.

There are two assignments of error upon which the plaintiff in error is entitled to another trial. The court charged the jury upon an assumed contention of the defendant, which was in fact not one of his contentions; and even though the instruction was abstractly correct as far as it went, it was not sufficiently full to obviate the injury inflicted upon the defendant by attributing to him a contention which he did not make. In his statement to the jury the defendant recited at some length his assignment to military duty and the effect that this produced upon his crops, and the separation which was thereby brought about between him and his wife; and that when he was discharged from the military service and returned home to find that his wife had become the mother of a bastard child, he declined to live with her; and then he told the jury plainly and distinctly that he did not intend to meet the deceased, that he had no idea of meeting him on the day on which the homicide subsequently occurred; that he was content, and so told the deceased, for the deceased to have his wife. There is not an intimation in the statement of the defendant nor is there a single fact in all the testimony to suggest that the shooting had any reference to the previous illicit relations between the wife of the soldier husband and her paramour who did not go to the war. There is a statement that the defendant was told by his wife that the deceased was the father of her bastard child; but so far as appears from the record, the husband, far from being vindictive or revengeful, conceded the possession of his former wife's body

to the deceased and assured him that he would have no interference from him. , It was therefore very serious error for the court to ascribe to the defendant a defense and contention that the defendant did not depend upon, and which in fact the record of the evidence entirely failed to present. The court charged the jury as follows: "It is contended on the part of the defendant that the deceased had been guilty of frequent sexual intercourse with his wife. I charge you, gentlemen, where in a murder case the defendant sets up the defense that the homicide was committed because the deceased had committed an act or acts of adultery with the wife of the defendant, it is incumbent upon the defendant to show that the killing was necessary to prevent the act of adultery, or to prevent the completion of the act after it had been begun. If you find from the evidence or the defendant's statement that the act of adultery had been completed, and a reasonable time, sufficient for reason to reascend its throne, had elapsed before the homicide was committed, the killing would be attributed to deliberate revenge, and the defendant would be guilty of the offense of murder."

This charge injected into the case a contention and issue not made either by the evidence or the defendant's statement, with the result that the jury was instructed to find the defendant guilty if in their opinion there had been sufficient time for reason to reascend its throne after the perpetration of the acts of adultery to which the defendant referred, notwithstanding the fact that no defense was urged for the killing on the ground of adultery, and on the contrary the defendant had stated that he had not lived nor wished to live with his wife for over a year, and that he had told the deceased that he was perfectly welcome to his wife whenever and wherever and so long as he might wish to have to do with her. This instruction was certainly an intimation that the defendant was making an unsuccessful attempt to establish the contention that the killing was justifiable on account of the former acts of adultery on the part of the deceased. As plainly shown by the statement of the accused as well as by the range of the testimony introduced in his behalf, the sole defense of the defendant was based upon the law of self-defense; and it was confusing, misleading, prejudicial, and harmful to the defendant to charge the jury upon a proposition not presented by either the evidence or the statement, and especially to denominate it as a contention of the

defendant and thereby place upon the defendant an added burden of proof in substantiation of a contention which he was not making. It is so well settled that it is error not only to charge incorrectly upon a contention made by a defendant if a statement and charge as to his contention is thought necessary, but also to charge as a contention of one accused of crime which he does not present, that citation of authority is not deemed necessary; and upon this ground of the motion alone the court erred in refusing a new trial.

The court also erred in ruling out the evidence of the witness Jim Richardson, that " I had occasion to arrest Jim Lee Wells pretty soon after the killing, and he had a pistol when I arrested him," and in withdrawing the same from the consideration of the jury trying the case. This testimony was in line with other testimony already in the record, showing that the deceased had a pistol at the time of the encounter and at the time that he was killed, which was picked up and carried off by Jim Lee Wells after the killing. It was in contradiction of the testimony of the witness Abbie Woolbright, a witness for the State, who swore that Jim Lee Wells had no pistol at the time he went to the shooting and killing; and we fail to see how the learned trial judge could have withdrawn the testimony of Richardson and yet have allowed the testimony directly in conflict therewith, which was adjudged to be material, to remain in the record. The testimony of Richardson was material and relevant, and was a strong circumstance corroborating other testimony in behalf of the defendant to the effect that the deceased had a pistol at the time of the killing, which was picked up by Jim Lee Wells immediately afterwards. This evidence bore out the contention of the defendant and the statements of his witnesses, and impeached the testimony of Abbie Woolbright, a sister of the deceased. Richardson was the arresting officer, and according to his testimony Jim Lee Wells's possession of a pistol was closely connected in point of time with the killing. The witness says: " Pretty soon after the killing he had a pistol when I arrested him." The question as to how closely this possession was connected as to time with the killing was certainly a jury question. The fact that Jim Lee Wells had a pistol immediately after the killing might have substantiated and established the theory and defense of the defendant, especially in view of the fact that one of the witnesses for the State had sworn positively that Jim Lee Wells had no pistol when he came to the scene of the killing.